# Carter's Estate.

*Words and phrases—"Court"—"Judge."*

1. By "court" is to be understood a tribunal officially assembled under authority of law at the appropriate time and place for the administration of justice. By "judge" is to be understood simply an officer or member of such tribunal. Whether an act is to be performed by one or the other is generally determined by the character of the act, but whenever it is a statutory power or duty conferred or prescribed upon the court it can only be discharged by the assembled tribunal, however composed, whether of one judge or several.

*Real estate—Orphans' Court—Guardian and ward—Appointment and removal of guardian—Minors—Sales of real estate—Improper purposes of sale—Validity.*

2. Where the actual purpose of the sale of the real estate of a minor is to convert the minor's estate into personalty, so that it may be inherited as such in case the minor should die before majority, the sale is invalid and should, upon application to the Orphans' Court, be set aside.

3. A judge of the Orphans' Court in chambers has no power to appoint or remove a guardian; such appointment or removal can only be made by the court after notice and hearing.

4. A minor above the age of fourteen years who had inherited a farm appeared in the Orphans' Court and chose a guardian; subsequently he was taken ill and desired that upon his death the farm might be inherited by his mother; a petition was presented to a judge of the Orphans' Court in chambers, for the removal of the guardian, and the substitution of another, and for a sale of the minor's real estate. No notice of the proceedings was given to the minor's guardian. The judge made the decree as prayed for; the farm was immediately conveyed and a return of the sale made. Shortly thereafter the minor died and heirs of his father's blood and his former guardian petitioned that the appointment of the substituted guardian be revoked; that the order of sale be set aside; that the deed for the conveyance of the real estate be declared invalid, and that the grantee therein be required to convey the land to such person as the court might find was entitled thereto. The Orphans' Court after hearing dismissed the petition. *Held,* that the order of sale was improperly made, that the removal of the

guardian in chambers and .without notice or hearing, was illegal, and that it was error to dismiss the petition.

Argued March 15, 1916.   Appeals, Nos. 453 and 454, Jan. T., 1915, by W. M. Carter, Guardian; and Christine Carter, Andrew Carter, W. M. Carter, Libbie Love, Hazel Carter and Christine Carter, from decrees of O. C. Bradford Co., Dec. T., 1913, Nos. 40 and 41, dismissing petition to set aside the sale of a minor's real estate, in Estate of Royal Carter, a Minor.   Before MESTREZAT, POTTER, STEWART, MOSCHZISKER and FRAZER, JJ.   Reversed.

Petition for a decree to set aside the sale of real estate of a minor.   Before MAXWELL, P. J.

The opinion of the Supreme Court states the facts.

The court dismissed the petition.   W. M. Carter, Guardian; and Christine Carter, Andrew Carter, W. M. Carter, Libbie Love, Hazel Carter and Christine Carter appealed.

*Errors assigned* were in dismissing the petition.

*J. C. Ingham,* with him *Charles J. Culver,* for appellants.—The court was without jurisdiction to decree the sale of the minor's real estate, where the real purpose sought was to change the character thereof by a conversion of the property into personalty to the end that it might be inherited as such.   .

*Wm. P. Wilson,* with him *J. Roy Lilley,* for appellee.

OPINION BY MR. JUSTICE STEWART, July 1, 1916:

It was an anomalous proceeding that gave rise to the present controversy.   It had for its object the sale of the real estate of a young man, which, because of his minority, he could dispose of himself neither by deed nor will, to the end that in case he died in minority his estate

might consist exclusively of personal property and the course of descent be changed accordingly. Royal Carter was the only child of Daniel Carter, a citizen of Bradford County. He inherited from his father a tract of land in Wysox Township in said county containing 128 acres. In April, 1913, being above the age of fourteen years, but in his minority by several years, he appeared in court and chose as his guardian his father's brother, W. M. Carter, who upon qualifying entered upon his duties as such guardian. Royal Carter was in delicate health, suffering from a chronic ailment, and in January following the appointment of his guardian he was removed from his home to a hospital at Sayre with a view to submitting himself to surgical treatment. He received no relief therefrom and was rapidly declining. He was concerned that his mother should succeed to his estate, and consulted with his medical attendant, Dr. H. C. Down, as to how this could be effected. Dr. Down suggested a will and prepared one giving the entire estate to the mother which was duly executed 17th January, 1914. The doctor having expressed some doubt as to the sufficiency of the will to accomplish the purpose in view, he was asked by Royal to inquire of some one by what plan his purpose could be accomplished. Later, on the same day, the doctor took the will with him to Towanda and there consulted counsel. He was advised that the end in view could only be accomplished by a sale of the land "going through the Orphans' Court." Acting upon the information received from counsel Dr. Down the very next day began effort to find a purchaser for the farm, and on the afternoon of the 21st he concluded a bargain with J. W. Conklin that the latter should become the purchaser at the price of $11,000 upon his agreeing to convey the property to Mrs. Carter, the mother of Royal, at any time within a year, upon payment to him of a like sum, with interest and expense incurred "in the proper supervision, preserving and conserving the property." The counsel thereupon prepared

a petition addressed to the Orphans' Court to be signed by Royal Carter asking for the appointment of Dr. Down, as his guardian, in which this statement appears: "That William Carter, his present guardian, has personal interests adverse to the interests and wishes of your petitioner, and your petitioner desires to change and substitute H. C. Down in the place and stead of the present guardian,—that your petitioner is seriously ill and confined in the Robert Packer Hospital, and his condition is precarious and the duration that he may be ill is indefinite." Dr. Down proceeded at once to Sayre, some eighteen miles distant, with this petition, had it there executed by the sick man, to whom he said nothing in regard to the proposed sale, and the same evening returned with it to Towanda. Later, during the same evening, about 9 o'clock, the counsel for Dr. Down met by appointment the President Judge in the latter's chambers. The petition for the appointment of Dr. Down as guardian was there presented, and the appointment ordered and the bond approved; within fifteen minutes thereafter the petition of Dr. Down as guardian was presented asking for an order to sell the ward's real estate at private sale to John W. Conklin for $11,000, representing that the said price was fair and adequate and better than could be obtained at public sale for the same, together with certificate to the same effect signed by four reputable citizens and bond; the petition was granted, the bond approved, and order of sale allowed; then, almost immediately, followed a return to the order of sale by the new guardian to John W. Conklin, which was also approved and confirmed. These papers with the several orders thereon were marked filed the same evening, and later in the course of the evening, the transaction was completed by the guardian executing a deed of conveyance to Conklin and the latter giving to the guardian his check for $1,000 and a note for $10,000 with the understanding that both were to be kept in the custody of the counsel, and not to be used except with the

consent of Dr. Down and his bondsmen, of whom Conklin was one. So far as appears they yet remain where they were placed. That there may be no mistake as to the purpose of this proceeding as understood by Dr. Down, his counsel and the President Judge, we quote from an admission filed in the case appearing as part of the record,

"That W. P. Wilson of the firm of Lilley & Wilson, of counsel for Royal Carter and Minnie J. Carter and H. C. Down, guardian, in the late afternoon of January 21, 1914, mentioned to the Hon. WILLIAM MAXWELL, President Judge, that he expected in a short time to present a petition to the court to appoint H. C. Down guardian of Royal Carter, a minor, of Wysox, Pa., who was nearly twenty-one years of age and who at the time was critically ill at the Sayre hospital, to supersede W. M. Carter who had previously qualified as such guardian, explaining that the minor was the owner of a valuable farm in Wysox Township, this county, subject to the dower interest of Minnie J. Carter, who was his mother; and that it was intended to at once make application for the sale of the said minor's real estate at private sale to John W. Conklin; that the condition of the said Royal Carter was precarious and it was not expected that he would live, and if he should recover, on account of his health would have to live elsewhere for a time at least, and it was to his financial interest to sell the property, and it was his wish and desire also that the property should be converted into personalty, so in the event of his death the property might be inherited absolutely by his mother Minnie J. Carter, briefly mentioning what proceedings were proposed, and inquired if the court would hear the matter as soon as the same could be presented. Judge MAXWELL inquired if it could be taken up the following day and he was informed that it was desirous of avoiding any delay whatever, for although the minor might live longer, it was not expected that he would live until the next day, and that one day's delay

might be too late.   Judge MAXWELL indicated that he
would be in his office after evening dinner, and such
papers might be presented as were desired, but he felt
that he wanted to examine the propriety of summarily
substituting H. C. Down as guardian of the minor.   The
papers on the subject were presented at 9 p. m. or shortly
thereafter, with attention called to the law and practice
set forth in Practice in Pennsylvania by William F.
Johnson, Orphans' Court Vol. and the facts outlined;
and on the petition of Royal Carter, and that of H. C.
Down, guardian, as filed in this case, the appointment
of guardian was made, and subsequently, probably fif-
teen minutes later, the orders for the sale of the real
estate, etc., were made and decreed by the court during
the evening of January 21, 1914, as they appear of rec-
ord.   All the papers were completed and filed about 10
o'clock p. m. January 21, 1914.   When W. P. Wilson as
said attorney appeared before the court at 9 o'clock, or
shortly thereafter, of said evening, practically the same
conversation took place between said Wilson and Judge
MAXWELL concerning the court's authority to summarily
appoint H. C. Down guardian of Royal Carter."

Royal Carter died the same night, within four or five
hours of the completion of the proceedings, still in his
minority.   Ten days later Conklin purchased from Mrs.
Carter, the mother, the option he had given her on the
land, paying her therefor the sum of $1,650.   In Febru-
ary following W. M. Carter, the originally appointed
guardian of Royal Carter, for himself and on behalf of
his mother, Christine Carter, surviving widow of Daniel
Carter, the father of Royal, Andrew Carter, brother of
petitioner and son of Daniel Carter, Libbie Love, a sis-
ter, and Hazel Carter and Christine Carter, daughters
of a deceased brother, presented his petition to the Or-
phans' Court of Bradford County setting forth the facts
above stated, and in addition averring that the land
which was the subject of the sale made to Conklin for
the sum of $11,000 was of the value of $15,000; that no

order was made removing petitioner from guardianship of Royal Carter; that no notice had been given him of proceedings to appoint H. C. Down in his place and stead; that he had no knowledge that such appointment was contemplated; that the court was without authority to appoint H. C. Down guardian at the time, under the circumstances and in the manner in which the appointment was made, and without notice to or removing the petitioner from the guardianship, and that such appointment was void; that the petitioners are of the same blood with Daniel Carter who was the first purchaser of the land, and as such they inherit the same on the death of Royal Carter to whom it had descended; that Minnie Carter, mother of said Royal Carter, is not of the blood of the said Daniel Carter, and that unless the proceeding that led up to the sale to Conklin be set aside and vacated they will be unlawfully deprived of their just rights. The petition prayed that the appointment of Down as guardian be revoked, that the order of sale be set aside, that the deed to Conklin be declared invalid and the grantee therein be required to convey the land to such person as the court may find to be entitled thereto. The answer filed by respondents did not controvert a single material fact that is above stated and was in effect a demurrer; nevertheless, the court proceeded to hear the evidence offered on either side which, while it disclosed in more detail the successive steps of the proceeding, developed nothing in addition to what we have stated that could affect in any way the real merits of the case. The facts found by the court are in entire harmony with what we have stated the facts to be, and the opinion filed in the case is merely an attempted defense on legal grounds of the action of the judge in connection with the appointment of a new guardian and the subsequent proceedings. The appeal is from a decree dismissing the petition.

We have said that the proceeding complained of was anomalous. First, as to its purpose. It is not denied

that, notwithstanding other reasons were stated in the application for the order to sell the real estate, the actual purpose was exactly what we have stated, namely, to effect a change in the descent of the minor's estate. Except for the accomplishment of this, the proceeding would never have been begun. The purpose was not one that should commend itself, least of all to a court, for the reason that it contemplated a misuse of the machinery of the law to effect a result that the law without such interference would not allow. The law is wiser than any of us, and in its wisdom it withholds from minors the right or privilege of directing what disposition is to be made of their property after death. To circumvent the law and enable this minor to do what the law declared him incompetent to do, a statute which was never intended for any such purpose was invoked and applied to meet the supposed exigency. In view of this manifest purpose which all concerned, the judge himself included, must have understood, it is idle to say that there were other reasons assigned in the application for the order of sale which brought the case within the statute empowering the courts to order the sale of the real estate of minors. We feel warranted in saying that, if any there were, such other reasons were assigned simply to give color to the proceeding. The petition alleged in general terms that it would be for the best interest of the minor to make sale of the property. Except for this averment the petition should have been summarily dismissed for want of jurisdiction, for certainly none of the averments brought the case within the purview of any statute authorizing the court to direct the sale of a minor's real estate. The fact that the ward was physically "in critical condition and the physicians and nurses in charge report to the petitioner that it is not at all hopeful that he would live any extended period," would not have given jurisdiction to a court, nor the fact that the minor "had personally positively expressed his desire and wishes to the petitioner to have

his real estate converted into personal property, believing the same is to his best interest, and will best carry out his personal wishes in relation to the disposition of his estate"; nor yet the fact that "if the minor should survive his present illness, it is the opinion of the best medical authority in the community that he will be unable personally to handle and manage the said property, and that it will be necessary for him to locate and live elsewhere, and it would therefore result in said property being handled and managed by others"; nor the fact, that "the funds arising from the sale will bring to the minor a better income than the land will produce as an investment." Not one of these averments, and we have recited them all, no matter how well supported, afforded any ground for this proceeding; but the combined effect of all upon the mind of petitioner was to convince him that it was for the interest of his ward that his real estate should be sold; and without inquiry or investigation, and so far as the record discloses, with nothing to rely on but the conclusion of the guardian, the judge ordered the sale on the ground that the sale would promote the best interest of the ward. When it is remembered that the ward was within four months of obtaining his majority and would then be able if he survived to dispose of his property as he pleased, it becomes too apparent for discussion that the sole purpose of the proceeding was not to meet any of the conditions recited in the guardian's petition except that one which expresses the desire of the ward to leave his entire estate to his mother. If the judge did not see it in this light, it must have been because the precipitancy with which the matter was presented and concluded gave him no opportunity to act more than perfunctorily. The whole proceeding was transacted and concluded within an hour, without notice to the guardian then in office, not in court but in the judge's chambers, with none present to enter objection. Under such conditions had the action been taken by the court instead of a judge, we

would not hesitate to declare that it was an abuse of discretion to grant the order of sale.

The next striking feature about the proceeding is that what was done was not done by the court, but by the judge who assumed the functions of the court. The distinction between the powers and duties of a court and the functions of a judge were lost sight of entirely, and what can be done only by a court was here attempted by the judge. The words "court" and "judge" are so frequently used interchangeably that it is not surprising that those unversed in legal terminology accept them as meaning the same thing, but the real distinction between them is too important to be overlooked by the practitioner. By "court" is to be understood a tribunal officially assembled under authority of law at the appropriate time and place for the administration of justice. By "judge" is to be understood simply an officer or member of such tribunal. Whether an act is to be performed by one or the other is generally determined by the character of the act, but whenever it is a statutory power or duty conferred or prescribed upon the court it can only be discharged by the assembled tribunal, however composed, whether of one judge or several. Take for instance the power to appoint and remove guardians of minors. Such power is conferred by statute not upon the judge, but in express terms upon the court. So too the power by decree to direct and supervise the administration of the estate of decedents. There are many things in connection with the general administration of justice that the individual judge may do and perform, some as incident to the office at common law, and others by statute conferring the power; but in the latter case it will always be found that the statute in so many words commits the power to the judge as distinguished from the court. No statute can be found authorizing a judge to either appoint or remove a guardian; as the appointment can be made only by the court, so the removal, and that upon notice and hearing. Both in this case were

summary, and in this respect so disregardful of legal rules that what was here attempted before a judge in his chambers would hardly have been attempted in open court. The whole proceeding was begun and completed in the office of the President Judge. Where that office is we are not informed, but we know it was not in the only appropriate place, the place appointed by law for the assembling of the several courts of Bradford County.

An opportunity was presented for correcting what had here been done by the judge when this present proceeding was begun in the Orphans' Court asking that the several unauthorized orders and decrees made by the judge heretofore referred to be revoked and cancelled, and what had been done thereunder nullified. The petition was filed in due time, the status then remaining unchanged. It is unnecessary to further recite the proceedings taken thereunder, except to say that the evidence taken again disclosed all the facts we have above stated, with the additional fact that within ten days after the order of sale had been granted and the purchase-money secured, the purchaser paid to the mother of the ward an additional sum of $1,650 in purchase of an option on the property which the guardian required him to give before the consent of the court to a private sale could be asked for. Then it was, if never before, that the court was fully advised that the sale had not been conducted in good faith either toward the court or the ward, a circumstance which, apart from the irregularity and defects in the proceeding to which we have adverted, of itself called loudly and imperatively for its annulment. It was an abuse of discretion on the part of the court to dismiss appellant's petition. The assignments of error are sustained; the decree is reversed; the petition is reinstated and a procedendo awarded.